**26SL-CC03303**

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

IN THE CIRCUIT COURT OF ST LOUIS COUNTY
STATE OF MISSOURI

Dr. Aimee Jokerst,                    )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )
                                       )
Logan University, Inc.                 )    Case No. _____
                                       )
        Defendant,                     )
                                       )
Serve:                                 )
Kate Nash                              )
34 N. Meramec, Suite 600               )
St. Louis, Mo 63105                    )

## PETITION FOR DAMAGES

Comes Now, Plaintiff, by and through counsel and files this Petition for Damages because of Defendant Logan University's ("Logan") long history of sex discrimination in pay in violation of the Equal Pay Act, 29 U.S.C. § 255, as follows:

### Introduction

1. This year, 2025, Logan is celebrating its 90th anniversary as an educational institution.

2. "As we mark the 90th anniversary of Logan University, we reflect on nearly a century of academic excellence, innovation, and community impact.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

Since our founding in 1935, we have grown from a small institution into a vibrant, engaging, and dynamic university that continues to shape the future." https://www.logan.edu/

3. "Over the past nine decades, our faculty, staff, and students have achieved remarkable milestones, pushing the boundaries of knowledge and making significant contributions to society. Our alumni have gone on to become leaders in their fields, embodying the values and education they received here."  https://www.logan.edu/

4. "This milestone is not just a celebration of our past, but a testament to our ongoing commitment to excellence and our vision for the future. As we look ahead, we remain dedicated to fostering an inclusive and innovative environment where every member of our community can thrive." https://www.logan.edu/

5. Although Logan publicly proclaims it fosters an inclusive environment where every member of its community "can thrive," the reality is an institution that has systemically discriminated against women in pay as demonstrated by the unlawful discrimination experienced by Plaintiff since she began her career in 2010.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

6.  Logan systematically overlooks, devalues, or undermines the women in leadership roles at the University which adversely impacts their pay and promotion.

7.  Plaintiff is a former employee, educator and leader of Defendant. She brings this action under the Equal Pay Act of 1963, 29 U.S.C. 206 et seq. ("EPA"), seeking redress and programmatic changes for females who have worked, who work or will work for Logan.

### Jurisdiction And Venue

8.  This action arises under the Equal Pay Act of 1963, 29 U.S.C. 206 et seq. ("EPA")

9.  The unlawful payment practices complained of herein were committed within St. Louis County, Missouri; therefore, this Court has personal jurisdiction over Defendant because its corporate offices are in St. Louis, Missouri, and the unlawful acts alleged occurred within St. Louis County, Missouri.

10.  This Court has subject matter jurisdiction over the EPA claims as it has concurrent jurisdiction with federal courts.

11.  Venue is proper as the discriminatory pay practices occurred in St. Louis County.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

12. Defendant conducts its business in St. Louis County.

## Parties

13. Plaintiff is a female resident of Missouri, and a former employee of Defendant, who worked as an educator and administrator of Defendant.

14. Defendant Logan is Plaintiff's former employer, and an employer as defined under the EPA.

15. At all times material to this action, Defendant has engaged in an industry affecting commerce, and had fifteen or more employees for each working day of twenty or more calendar weeks.

## General Allegations

16. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-15 above as fully stated herein.

17. Plaintiff was hired May 26, 2010 as a clinician at Logan. Prior to the hire date, Plaintiff was told her salary would be $60,000. When Plaintiff went to sign the contract, it was for $56,000, instead of the $60,000.

18. Plaintiff spoke to the then HR director, Les Lexow, as to why there was a change. Lexow just said that was the starting salary he was given. Plaintiff was also told she couldn't use any vacation days for 6 months even

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

though that was inaccurate information, so she didn't use any vacation days even though she was commuting every day from Jefferson City.

19.  Males hired two years prior to Plaintiff doing the same work were paid more upon hire.  Mike Jula was hired at $57,500 two years earlier and was making $60,000+ by the time Plaintiff was hired.  Plaintiff had significantly more experience and had been in practice longer and had more qualifications.  Additionally, another clinician, Jason Goodman, who was the son of the then president, George Goodman, was paid at least $90,000, and possibly more.  Again, Goodman's experience was not commiserate with that salary and it was from nepotism.

20.  When Plaintiff spoke to other employees at the time about these hiring practices and pay discrepancies, she was told that if Dr. George Goodman liked you, he would pay you more, otherwise he would start you lower and that women were typically started lower.

21.  In January 2011, Defendant hired Ed Johnnie as a clinician (approx. 6 months after Plaintiff) and was hired at $60,000.

22.  In November or December 2011, Allison Harvey, female, was hired as a clinician at $56,000.  She was hired to replace Ed Johnnie who decided to leave his position at Logan.

Electronically Filed - St. Louis County - April 23, 2026 - 12:00 AM

23.  November 2011, Logan was looking for a way to eliminate a clinician salary, as relayed to Plaintiff by Dr. Ralph Barrelle who was a cabinet member at the time.

24.  Defendant's attorney at the time, Laura Mclaughlin, came across what appeared to be a lapse in Plaintiff's chiropractic license for a period of days.

25.  This was not a true lapse.  Plaintiff explained to her and to several administrators at the time that this was an error on behalf of the State of Missouri and that the lapse hadn't happened.

26.  Plaintiff also informed Logan that she had been in open communication with her supervisor, Dr. Michael Wittmer, at the time this was all occurring, and he was aware of the situation.

27.  Plaintiff additionally informed Logan that during the time she was straightening out this error, she was not practicing and was not at Logan.

28.  Plaintiff had taken those days off and didn't come in to clinic. Plaintiff was still commuting from Jefferson City that summer and didn't even come to St. Louis during those days while clearing up the error with the state and the board.  Plaintiff moved to St. Louis in Aug 2011.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

29. Logan, despite knowing these facts, chose to allow Laura Mclaughlin and George Goodman to use that scenario as a reason to terminate Plaintiff's employment.

30. Plaintiff was terminated on Wednesday, November 23, 2011, in the evening the night before Thanksgiving when she was hosting twenty people the next day. This is significant as it was George Goodman's *modus operandi* to terminate people when it would hurt them the most. Goodman previously fired a senior leadership employee while on vacation with his family etc.

31. Dr. Barralle and Dr. Wittmer assisted Plaintiff with contacting the Missouri State Board of Chiropractic Examiners and its attorney. The State Board confirmed in a letter the lapse in Plaintiff's license never occurred and its attorney told Plaintiff she was wrongfully terminated and should pursue legal action.

32. Plaintiff did consult with an attorney but ultimately decided to just seek reinstatement instead of dragging the situation out in a case against Logan, especially that early in her career there.

33. However, when Plaintiff was re-instated approximately a week or so after her unlawful termination, she was brought back with a $500 **decrease** in salary and put on probation, even though she hadn't done anything wrong.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

34. Plaintiff had to use her vacation days to cover the period during which she was wrongfully terminated in order to receive the back pay for that period.

35. Additionally, when Plaintiff was brought back, Logan put another clinician who was assigned to the same clinic she was, Dr Jeff Kamper, as her immediate supervisor.

36. Plaintiff was the only clinician who then had another clinician as an immediate supervisor, her true supervisor was still Dr. Wittmer. Laura McLaughlin and George Goodman was responsible for these retaliatory actions. Additionally, even though Kamper had only been my supervisor for a matter of weeks, Laura McLaughlin insisted he give Plaintiff a poor performance review. Plaintiff spoke with Dr. Wittmer and wrote a rebuttal. Dr. Wittmer supported my rebuttal. Very quickly, Dr. Kamper was removed as my supervisor by Dr. Wittmer as he felt he was targeting Plaintiff and he moved Kamper back to the main campus clinic.

37. Plaintiff discovered that Kamper hung out socially with Laura Mclaughlin and others. Years later, Kamper admitted to Plaintiff that he was coerced to giving her a poor review and that he thought it would 'protect me'.

38.  In August 2012, Logan hired Mero Nunez as a clinician at the clinic Plaintiff was assigned.  He was hired for $60,000 which was still more than Plaintiff was making after being with Logan for two years.

39.  In 2013, Logan rehired Ed Johnnie as a clinician at Logan at the salary he left at, which was more than $60,000 and more than Plaintiff was making  at that point in 2013.

40.  In Spring 2013 during an open enrollment meeting for our health insurance, Laura Mclaughlin was presenting the insurance options.  As a faculty member, Plaintiff had 12 weeks paid FMLA.  Plaintiff knew she was going to require spinal surgery, so she wanted to make sure that was still going to be a part of Logan's policies or find out if she needed to take out short-term disability insurance during the enrollment period.  Plaintiff went up to Mclaughlin and asked her what the policy was.  Laughlin told Plaintiff that it was still Logan's policy to cover the FMLA as a faculty member but that they may choose to not renew Plaintiff's contract (contract was up Sept 1) if she chose to be out for surgery.  Plaintiff immediately went to her supervisor, Mike Wittmer, to tell him what she had said, which Plaintiff perceived as a threat of retaliation for exercising her protected FMLA rights.

Plaintiff does not know what Wittmer did with that complaint from Plaintiff

Electronically Filed - St. Louis County - April 23, 2026 - 12:00 AM

Mike chose except Wittmer told Plaintiff he knew Laughlin still wanted to find a reason to fire Plaintiff.

41. In January 2014, Plaintiff had her first major cervical spine surgery. Plaintiff took less than a month off of work as she was still fearful of losing her job. Plaintiff should have taken much more time to recover but was afraid to do so. Fewer than twelve weeks later, in a show of commitment to the university and her students, Plaintiff traveled to Costa Rica for Logan's first ever Clinic Abroad trip. Plaintiff, two other clinicians and sixteen student interns went on this 10-day trip.

42. In 2015, Muriel Perillat, Plaintiff's supervisor at the time, pulled her aside (and Allison Harvey separately) and told both of them that we were the lowest paid clinicians and that we were significantly underpaid and that there was a $10,000 pay disparity. Perillat stated she didn't have it in her budget to give us all of that money at once but that she would start with a small incremental raise and give us a raise each year the next couple of years until it was rectified.

43. In March/April 2016, Plaintiff was injured by a student intern in clinic after a piece of decompression equipment she was utilizing on her neck malfunctioned and Plaintiff asked him to see what had happened. The intern improperly reset the machine and ruptured a disc in Plaintiff's neck.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

44. Two days later, Plaintiff was in such extreme pain she was in the ER awaiting surgery. The surgery was delayed a week for insurance verification. By the time surgery was performed (April 2016), a portion of Plaintiff's C7/T1 disc was crushing her C8 spinal nerve and the dura of her spinal cord. Both the C8 nerve and the dura tore during surgery as they were stuck to both the disc and bone.

45. Plaintiff still has permanent damage to her right arm due to this nerve damage. Plaintiff was unable to use her hand or arm at all for three months and it took her fourteen months+ to regain strength. It is still weaker to this day. This is her dominant hand. This not only caused Plaintiff to be off work at Logan for three months, it caused her to not be able to treat patients and lose significant income. Plaintiff continues to have issues due to this injury and require another surgery that she has been putting off.

46. In Mid July 2016, Plaintiff returns to work at Logan after 12 weeks of FMLA. During preparation for pre-contract meetings, Plaintiff called Dr. Perillat and asked her if she remembered to put Plaintiff's additional raise in the contract. Dr. Perillat was very irritated and told Plaintiff that she never said that and did not give me additional money in her contract.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

47. Plaintiff was upset about not receiving the raise that she was counting on and confused as to why Muriel Perillat seemed to be upset with Plaintiff. What Plaintiff didn't know was that Alissa Dawson (an administrative assistant in charge of the front desk staff at each of the clinics) had started lying to Perillat about me as she was angry that I was friends and neighbors with one of the front desk women who worked at my clinic, Laura Kuennen, who was her best friend and for some reason she was jealous.

48. In August 2016, Plaintiff met with Muriel Perillat and Kimberly O'Reilly (the Vice President) for our regular scheduled pre-contract meeting. This is a meeting where you are supposed to discuss your salary, goals for the upcoming year, etc. Instead, Perillat told Plaintiff she wasn't sure she was going to offer her a contract. Perillat said that she had learned that Plaintif was treating personal patients at Southfield (Logan clinic) while she was out on FMLA. Plaintiff told her this was not true, that she barely had use of her arm and couldn't even open a bag of potato chips much less adjust someone.

49. Plaintiff offered to open her calendar and show her the patient schedules. She declined to look at it and stated that she was not prepared to do that at that time. As Plaintiff was leaving the meeting she ran into Alissa Dawson in the hallway. She didn't work on that floor or in that area, it

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

should have raised a question in Plaintiff's mind, but it didn't at the time.

Later that day, Plaintiff went to work at Southfield and was confused how Muriel could have thought this was occurring.

50.    Plaintiff went straight into her office and didn't speak to anyone when she first arrived.  A few minutes later, Plaintiff got a call from Muriel screaming at her on the phone.  Plaintiff couldn't understand her at first as she has a very strong French accent and was screaming.  Plaintiff had to ask her multiple times to repeat herself so she could understand what she was upset about.  She told me that Plaintiff had come into the office and screamed at Sara Thoele, a front desk person at Southfield, upon Plaintiff's arrival. Plaintiff told her she hadn't done that.  Muriel told Plaintiff she was going to come to clinic and speak to her.  Plaintiff told her to come and we could talk about this.  Muriel didn't visit Plaintiff that afternoon.

51.    Plaintiff did, however, ask Sara if she thought Plaintiff had done anything.  She said, no, of course not.  Plaintiff told her what happened, she started to cry as she had no idea how or why she was brought into this and didn't want me to be in trouble for anything, especially something I hadn't done.  She called Alissa, who was her boss and told her nothing had

happened.  Plaintiff didn't know Alissa was the problem.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

52.  A few days later, when Plaintiff got to clinic, Muriel and Nichole Nichols, head of HR, were already waiting for her when she arrived, unbeknownst to her.  They witnessed Plaintiff saying hello to the front desk and had already spoken to the front desk staff about her and our relationship.  Plaintiff explained that none of the things Muriel was accusing Plaintiff of had occurred.  Nichole told Plaintiff that it appeared like she had a great relationship with Laura and Sara.  Nichole later called Plaintiff within a day or two of that meeting and told her that she felt bad for Plaintiff and that she realized after meeting her that none of this was true.  She told me that both Laura and Sara had spoken very highly of me and that they thought I was great to work with.  So, I hoped that was the end of it.

53.  In August 2016, a couple of weeks after the previous incident, on a Thursday or a Friday, Plaintiff again arrived at her office to find Muriel and Nichole Nichols sitting in the waiting room of her clinic.  Muriel told Plaintiff that she was moving her from her clinic and assigning her to be a clinician at main campus, Montgomery Health center clinic ("MHC").  Muriel was switching Plaintiff and Allison Harvey, who was a clinician on campus.  Muriel told Plaintiff she would start there on the following Monday.

54.  Plaintiff only had the weekend to move her office, couldn't tell her interns or patients who she had been working with.  Plaintiff started

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

Southfield since it opened and ran that clinic. Plaintiff had known some of those patients for 5-6 years at this point (Southroads first and then Southfield from Aug 2011 on).

55. Plaintiff knew this was a punishment for something she **hadn't done** and that Muriel had no proof. So, Plaintiff moved immediately to MHC. Within a couple of weeks or month of Plaintiff's move to MHC, Alissa was somehow discovered or exposed and she was fired. However, the damage had already been done. Additionally, when she moved Allison to Southfield, she made her a 'Senior Clinician' (a new position at each clinic) and gave her a $1500 raise that Plaintiff would have received if Plaintiff had stayed there and she didn't want her eligible for.

56. In April 2017, Plaintiff went on the last Clinic abroad (medical mission trip) for Logan. It was Plaintiff's 3rd or 4th mission trip for them. During that trip, the conditions were not good and all of us (Plaintiff and 4 student interns) got sick. Plaintiff stayed sick for quite some time afterward which ultimately led to some additional health problems.

57. In May, Plaintiff was working in clinic and felt really bad. Plaintiff didn't want to miss work for continued fear of losing her job or being targeted. Plaintiff was so bad while she was at work that a colleague told her if she didn't go to the ER, she was going to call an ambulance. Plaintiff finally

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

went.  Plaintiff had pericarditis and a pulmonary embolism.  Plaintiff ended up in the ICU.  While in the ICU, Plaintiff messaged her boss and another supervisor (Muriel Perrillat and Barry Weise) and told them she was in the hospital and wouldn't be in clinic the next day and would need coverage. Neither of them responded to her message at all.

58.  Plaintiff ended up calling Dr. Weise to make sure someone had received the message.  His response was that they had.   That was all.  No expression of concern or any acknowledgement of what led to Plaintiff in the hospital etc.

59.  Plaintiff pressed her doctor to return to work as soon as possible and was released within two-three weeks.  Plaintiff was placed on restrictions to work no more than 4 hours per day as per my return to work FMLA paperwork.  However, Dr. Perillat did not arrange coverage for Plaintiff so she worked her full shift (8+ hours) each day and didn't abide by the mandated medical requirements.

60.  In Summer 2017, Muriel either moved or was removed from her position and opened Logan's Pediatric clinic within Logan's campus health center.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

61. A new clinic director, Calvin Thomas, took over the clinics. Plaintiff does not know Thomas' starting salary, but is aware he was listed at $156,000 on Logan's IRS Form 990.

62. In August 2017, Plaintiff won an award as voted on by the graduating class as being the top clinician.

63. End of August/beginning of September, Thomas moved clinician assignments around and moved Plaintiff from outpatient clinic to in charge of the Student Health Center ("SHC"). This was a director position, previously held by Muriel Perrillat prior to her being put in charge of all health centers as Dean of Clinic and then held by Gene Spilker as SHC Director. Gene Spilker had just been fired.

64. However, Thomas didn't give Plaintiff the title of Director and didn't give her a raise for it. He just put Plaintiff as Senior clinician on Logan's personnel records and called me SHC director to all others in discussions or conversations.

65. Plaintiff performed all of the SHC director duties, while still maintaining her own intern groups. This was not something any other SHC director had done — continue to be on the floor and have interns regularly. They were all also paid accordingly as a Director. Plaintiff was not.

Additionally, Plaintiff was not given an office.  She was using a conference room as a makeshift office.

66.  In 2018, Plaintiff started working more closely with Vince Debonno who was the Dean of the College of Chiropractic at that time.  Plaintiff started being involved in some additional leadership meetings as well.

67.  Plaintiff learned that Debonno was authorizing overload pay for additional duties, and stipends, though at this time it was reserved mostly for faculty teaching additional courses, or Debonno's friends or confidant, and for Dana Underkofler Mercer, a faculty member whom he was having an affair.

68.  Plaintiff additionally learned that Debonno was paying Erika Evans, a clinician who was good friends with Dana and therefore Vince at that time, a significant amount of overload pay.  In mid 2018, Plaintiff began negotiating being paid some overload pay for her duties as director.  However, it was still less overload money than Debonno was paying Erika Evans as a clinician.

69.  End of 2018 or beginning of 2019, Thomas' job duties shifted and he was no longer supervising all of clinics or clinicians.  Jeff Kamper was put over clinics and clinicians in some capacity.  He was named as a 'liaison' of some type while Debonno tried to figure out a way to eliminate Thomas completely.

70. In March 2019, Jeff Kamper was removed as clinic liaison/director. Plaintiff was put in charge of Logan Clinics and Clinicians as Assistant Director of Clinical Experience.

71. Jason Goodman (who was a clinician at one of our clinics), Vince's friend and son of previous president George Goodman, was named as Director of Clinical experience. Goodman was in charge of rotation and preceptorships (which he was already doing and stipend for already) and Plaintiff was in charge of Logan's clinics. Yet, Debonno made Goodman Plaintiff's boss so that he could pay him more.

72. Debonno also pushed through Goodman's faculty rank advancement early so that he could benefit from the additional 6% pay raise that you get with rank advancement as faculty that you do not get as an administrator (who are categorized as administrative faculty or staff). Debonno refused to do the same thing for Plaintiff. Additionally, Debonno only approved a small raise for Plaintiff at that point with her advancement to Assistant Director.

73. Although Plaintiff was in charge of the Logan clinics, clinicians and student interns, because Goodman was listed on paper as her boss and her title was Assistant Director, this caused a lot of confusion during Plaintiff's transition to leadership of the entire clinic system. Some individuals who

were closely aligned with Debonno or Goodman, would go around Plaintiff to Goodman to try to get things they wanted done or for special treatment.  This situation was later rectified with changing of our titles in 2020 with the then new Dean, Joe Pfeifer.

74.  As Assistant Director of Clinical Experience (Clinic Director), Plaintiff was not given an admin assistant (as other directors had) and was still using the conference room as her office.  At some point in 2019, Logan finally did convert that room to her office.

75.  In Summer 2019, Plaintiff asked for an additional raise.  Debonno declined it.  Plaintiff went to the VP, Kimberly O'Reilly, and gave her a list of all of her job duties and the things Plaintiff was doing or responsible for.  She then double checked all of Plaintiff's info as she felt Plaintiff was listing other people's assigned duties as well.  She found Plaintiff was doing all of the items listed and gave me an additional $5000 raise.

76.  In **August 2019, Debonno** had Plaintiff arrange a training for clinicians with a new therapy equipment, called **ARP** therapy.  Plaintiff didn't know at the time that the company had hired Debonno to try to implement ARP therapy at Logan and to do research on their equipment to help to validate it.  Additionally, the company behind the ARP equipment, were hoping that our clinicians and students would adopt the therapy and

help drive their sales and their therapy. The company "donated" quite a few ARP units and PRS (smaller units) to Logan. Debonno distributed these units to clinicians as "their own" to "do with what they wanted" and to "play around with it and give an opinion". No one was ever told this equipment was anything other than a donation. No one was ever told this equipment was actually on loan or what the underlying purpose was. Additionally, at the weekend training, one of the ARP employees demonstrated the therapy on Plaintiff's shoulder (while using water as an additional conductor for the direct current) and injured her shoulder. It tore Plaintiff's labrum, which still bothers her today and may require surgery on likely in near future.

77. Plaintiff had a clinician retreat approved (approved by Debonno and O'Reilly) for the Spring. This retreat was to revamp clinic protocols and procedures. Plaintiff had the available clinic budget but needed approval due to the cost being over a certain threshold that therefore needed supervisor approval.

78. In Late 2019, Debonno was removed as Dean of CoC. At some point then he was placed in a newly developed position as Director of Innovation (or something to that extent).

Electronically Filed - St. Louis County - April 23, 2026 - 12:00 AM

79.  In December 2019, Thomas was fired from Logan. He accepted severance package, and his termination was recorded as a resignation from Logan.

80.  In March 2020, Logan hired a new dean, Joe Pfeifer.

81.  That same month, Pfeifer revoked approval for clinician retreat as he wanted to be involved and didn't want to sign off on money right away.

82.  Pfeifer didn't move to St. Louis until late summer 2020.  He worked remotely in Oregon from date of hire until late summer.

83.  In September 2020, Pfeifer changed Plaintiff's title to Director of Montgomery Health Center.  Debonno had been placed in charge of Logan's Mid Rivers and Paraquad health centers as part of his 'Innovation'.

84.  At the end of 2020 or early 2021, Kimberly O'Reilly was fired from Logan and Debonno was promoted to Interim Vice President.  O'Reilly accepted severance package, and resigned from Logan.

85.  Debonno and Pfeifer did not get along and did not work well together. There was significant friction.

86.  In Sept 2021, Plaintiff's title changed to Director of Logan University Health Centers.  Plaintiff took over the MR and PQ clinics and Debonno was no longer supervising these locations.

87.  Throughout 2021, Joseph Pfeifer became increasingly difficult to work with.  Plaintiff was a misogynist and had many difficulties working with and supervising women.  Many women came forward, including Plaintiff, Kristina Petrocco Napuli, Jason Goodman and many female faculty and staff members.

88.  Multiple discussions were had with Clay McDonald from the end of 2021 through mid 2022 regarding Dr. Pfeifer and his treatment of women and his poor leadership.  Dr. McDonald failed to act on any of this until he was forced to due to the sheer number of complaints coming in against Pfeifer and his complete lack of leadership and failure to accomplish his duties.

89.  Plaintiff filed a formal complaint with HR regarding Pfeifer, as did many other women.

90.  No action was made against Joe Pfeifer until the time McAuley Mcauley was hired and started at Logan in July 2022.

91.  Joe Pfeifer was placed on administrative leave July 2022 and accepted a significant severance package and resigned end of July/early August 2022.

92.  In Jan/Feb 2023, Plaintiff was made aware of a grant that Logan received from the MFH. The grant had nothing to do with Logan's mission or

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

with Chiropractic at all.  Debonno and Mercer had applied for the grant that was an initiative to expand Medicaid in Missouri, especially with focus on Hispanic population.  The grant was actually awarded in 2022 but neither Debonno or Mercer had actually done any work once Logan obtained the grant to act on it.

93.  As a result, Plaintiff was brought in to help facilitate finding the appropriate people to use the grant money and fulfill the program. Logan had a series of meetings to see if this was feasible to do with everyone's current workload and availability and who if anyone would be the appropriate person.  We as a group, led by Theresa Fleck (head of Institutional advancement) and Mercer (the one who applied and was awarded the grant) came to the conclusion that it wasn't possible for Logan to fulfill it on the timeline they needed and we would be returning the money.  This was not anything that anyone wanted to do as it would make Logan look bad and likely limit our grant awards in the future.

94.  However, Mcauley had told us that if we came to that conclusion, then he would support it.  The only two candidates who could have fulfilled the obligations were Dr. Patty Estrada (PQ clinician) and Sara Thoele (the front desk/PSR at PQ).  However, the both of them were spread pretty thin and were not sure they could commit the time and energy necessary.  We also

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

looked into compensating them for the extra hours with the grant money (instead of salarying someone new for a part time position).

95.  In February 2023, Plaintiff heard from Jason Goodman or Kris Petrocco that ARP wanted to have a clinic within our MR clinic location. Petrocco and Plaintiff were both opposed to this and discussed concerns about it.

96.  On February 28, 2023, a group met with McAuley McAuley. The meeting included all females- Nichole Nichols (head of HR), Theresa Fleck (cabinet member and head of IA), Dana Mercer Underkofler (faculty member), Plaintiff, Patty Estrada (clinician at PQ) and McAuley McAuley. During that meeting was the first time Plaintiff, and many others, saw the other side of McAuley McAuley.

97.  McAuley came in and told everyone present that he was already angry. Fleck informed him that the group had decided to give the money back to MFH.  He became significantly angrier and told everyone that he would not accept that as an option and we were to sit at that table until we came up with another solution.  There was no other alternative.  McAuley was aggressive and bullying throughout the meeting.  The group felt uncomfortable and it significantly impacted all of our perceptions of him from that moment forward.  It was absolutely inappropriate behavior.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

98.  McAuley asked who would be the people who could do the tasks. Plaintiff let him know that only Estrada, Thoele and another clinician, Mero Nunez, would be qualified and appropriate.  However, that they were all spread thin and would have to have bandwidth to do so and Logan would have to compensate them and give them time away from clinic to perform these additional duties. This would also have an effect on Logan's clinic system and its students and patient's experience and revenue in that way as well.

99.  While the group were all sitting at the table in the meeting, McAuley pressured Estrada into having to say yes and accept this additional job (for an additional 20-hour commitment per week) and then had Plaintiff call Thoele on speaker phone right then and ask/pressure her into accepting as well.  I spoke to Mero after the meeting to include him as well.

100.  In February 2023, Vince Debonno and Lee VanDusen (Lee was head of Strategic Performance and Continuous improvement-a Cabinet position) resigned from Logan when their options were to resign, be fired or be demoted.  They both took the significant severance package, and resigned.

101.  In March 2023, Petrocco found out there was a contract proposed by ARP to take over a portion of Logan's MR clinic space.  Petrocco told me she was opposed to it and sent the contract to the school's attorney, Kate

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

Nash, to review.  Petrocco thought this would put an end to the potential agreement and if not, then buy some time to make it a better arrangement or come up with alternatives.  Later Plaintiff and Petrocco found out that the contract was never evaluated by the attorney and instead was signed the next day by Logan.

102.  On Thursday, April 13, 2023, while at a Cardinal game with a group of clinicians from Logan, Plaintiff learned from Leslie Reece (a clinician at MR) that the ARP deal had gone through and ARP was going to be in town as of that weekend to start at Mid Rivers on Monday and that she was to be the clinician assigned to ARP.

103.  Plaintiff had no idea any of this was occurring.  She reached out to Petrocco and she didn't either.  Neither Petrocco, the Dean of the CoC nor Plaintiff, the Director or Logan Health Centers, were consulted on a deal that affected the clinic Plaintiff ran and in a program that Petrocco was in charge of.

101.  Plaintiff knew at this point that Debonno was also an employee of ARP and that Goodman was in on this deal.  Plaintiff also knew that McAuley was aware of it all and left Petrocco and Plaintiff out of it purposefully.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

102.  However, in doing so, they only accomplished making sure this would be a failure from the start.  Neither ARP nor Logan did anything to prepare for the opening of this new clinic.  No advertising, no set up, no plan for computer or front desk or phones or notifying our current patients that Dr. Reece wouldn't be their clinician anymore.

103.  Logan did nothing required by the State of Missouri to ensure we weren't abandoning Dr. Reece's patients, etc.  Logan had done nothing to prepare or plan for this clinic and had left Plaintiff out of all of it.

104.  On Monday, April 17, 2023, Plaintiff spoke to Goodman about the ARP contract.  Plaintiff and Goodman met with Jake (ARP trainer in town for a couple of months starting then) and Leslie at Circle 7 over lunch to discuss what was happening.  It was clear to Plaintiff from that initial meeting that ARP was promised (by Goodman and Debonno) that Logan would just have Dr. Reece start seeing her Logan patients under ARP now and that is why they didn't care about notifying patients ahead of time.

105.  Plaintiff explained that this was a violation of Stark Law and a bait and switch in her opinion.

106.  Logan couldn't take patients who were used to paying $10/visit and now charge them $70-150/visit (and Logan get a 5% kickback per visit) without notifying them and giving them other alternatives.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

107.  Additionally, Plaintiff didn't think that Logan could refer them to an entity within its clinic that Logan were getting paid by and a percentage of profits from.

108.  After significant push back from Plaintiff, Debonno and Goodman agreed Logan would put a letter out to patients letting them know of the change.

109.  Plaintiff also told them they would need a phone line and front desk as a separate clinic.  Plaintiff expressed in that meeting that she could help them plan for the official opening of this clinic and all components necessary but they would need to include her in discussions and planning.

110.  When all was said and done, they did none of this and actively tried to just take Logan patients anyway by asking for access to our patient lists, never getting phone or separate front desk person and many other issues.  They ultimately ended up paying Logan's PSR (MR front desk person, Cassidy Enloe) an extra $2/hour just to do their work full time in addition to theirs and repeatedly asking her to do things she wasn't comfortable with. Additionally, it was this day that Petrocco found out they had signed the ARP contract in March, the day after Petrocco had sent it to Kate Nash to review. Goodman and McAuley had it pulled from the school's attorney, Nash, before she had reviewed it and went forward with signing the contract as it was

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

written.  Neither of them, nor anyone else, told Plaintiff or Petrocco that the contract had been signed.

110.  At some point in May, Reece told Plaintiff that Jake and ARP wanted to take out some of the rooms we had at MR and take them over for ARP.  We discussed how this wasn't in the contracted space for ARP and those were offices currently held by the College of Health Sciences at Logan.  Plaintiff thought the matter had dropped, but apparently it hadn't.  As it came to a head in the incident with Reece on Memorial Day weekend.

111.  On Memorial Day weekend, an incident occurred with Jake (ARP) and Reece on Saturday night.  Reece reached out to Plaintiff on Sunday morning.

112.  Plaintiff went to Mid Rivers and spoke to Jake Tuesday morning.  During this meeting with Jake, Plaintiff told him again that she was the point of contact for any questions or anything with the clinic. ARP refused again to abide by this as they were on the phone with Jason Goodman when I returned to campus.

113.  Jo Ellis (administrative assistant) overheard Goodman on the phone and came let Plaintiff know, so she went and overheard the conversation also.  Goodman was speaking loudly and saying that 'that bitch is an obstacle' and other things along those lines.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

114.  Plaintiff confronted him after the call and he told me he was speaking about Reece and Jo Ellis.  However, it was clear he was also including me in those remarks,  and they were unprofessional in the workplace.

115.  Plaintiff didn't here from or about ARP until around June 10, 2023, when she spoke to Goodman.

116.  Then, Goodman told Plaintiff there was a problem with ARP and that they wanted Reece fired and they didn't want to work with her anymore.  He also spoke to Plaintiff  about the incident with the woman affiliated with ARP who came to MR to work on patients for ARP and the confrontation with Reece.  That is when he gave Plaintiff a copy of the email from her and her signature line was 'billing specialist'.

117.  Plaintiff reached out to McAuley McAuley that day via email and asked to meet with him.  He refused to meet with Plaintiff. His message if it was ARP related, Plaintiff needed to work it out with Goodman and that if he did ever have to meet with Plaintiff about it that it would be a much different meeting and involve others and that neither of us wanted that (or something to that extent and/or similar threats).

118.  Petrocco was out of town when this happened.  Upon her return, Plaintiff began discussions with Petrocco regarding ARP.

119. On July 5, 2023, Jason Goodman attacked Plaintiff via text messages for not supporting ARP and for calling them out for fraudulent behavior.

120. Starting in July, after Plaintiff's interaction with Goodman, a coordinated attack began on Plaintiff by ARP (McAuley Miller), Goodman and Mercer. Miller, Goodman and Mercer sent emails to Clay McDonald, McAuley, Petrocco, Adil Kahn, CFO of Logan, and others attacking Plaintiff and her work performance. They specifically attacked Plaintiff's handling of ARP. None of it was factual or had any basis.

121. Plaintiff worked with Nichole Nichols to respond to McAuley Miller's emails.

122. Plaintiff filed a complaint with HR.

123. On July 17, 2023, Plaintiff was in Toronto for a national clinic directors meeting. Plaintiff was the Chair of that group, ACC Chief Clinic administrators. Plaintiff met via zoom/teams with McAuley McAuley, Theresa Fleck, Kris Petrocco, Jason Goodman, Nichole Nichols and Tim Gross. This was to decide a path forward with ARP.

124. During this meeting, McAuley told Plaintiff that she was against the Universities Strategic Priorities and Initiatives. He also told Plaintiff

that she should have brought up her concerns earlier if she thought they were fraudulent or were issues. Plaintiff had tried to but McAuley had refused to speak with Plaintiff and refused to meet with her.

125. Plaintiff had already spoken to Petrocco and Fleck (Fleck is the head of Institutional Advancement ("IA"), a cabinet member and Goodman's boss) prior to our July 17 meeting. They both felt Logan should terminate its relationship with ARP, that Plaintiff had done nothing wrong and that Goodman shouldn't be involved with the relationship.

126. During this meeting, McAuley expressed that he thought Goodman should continue to lead the ARP relationship. Fleck told him that wasn't possible and not his job.

127. McAuley then appointed Tim Gross to be in charge of the relationship and to decide how Logan would move forward. Gross was McAuley's longtime friend who he brought to Logan. However, Tim was also impartial in this relationship as he had already vocalized to me that he thought this wasn't a good idea and not a viable relationship and the model wouldn't work in our clinic but that he would look objectively.

128. At some point within a week or two of this July video meeting, Gross, Fleck and Goodman went to Chicago to ARP headquarters.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

129.  Gross and Fleck both determined that this was a company that Logan should not be affiliated with.  They were shown fraudulent or unethical insurance billing by Brian Miller (head of ARP) and additionally were uncomfortable with other things they had seen or been told while there.

130.  When they came back, Gross told McAuley that he felt Plaintiff was the scapegoat and that he agreed with what Plaintiff had said and that Logan should terminate the relationship.  McAuley said he wanted to get Goodman's opinion.

131.  In August,  McAuley and Clay McDonald approach Petrocco with the opinion Logan's clinic system wasn't successful under Plaintiff's direction.

132.  Petrocoo was given about a week to write a proposal to defend Logan's clinic system and essentially defend Plaintiff's job performance.

133.  Plaintiff and Petrocco worked together to assemble all data to show how Logan's clinic system was a success by any objective measure.

134.  Petrocco made her presentation in the beginning of September.  It was implied that Plaintiff's job and the jobs of clinicians would be on the line if her presentation wasn't a success.

135.  Petrocco gave Plaintiff a paper copy of this presentation.  After her presentation, McDonald was impressed with how well the clinics were

doing and Petrocco told Plaintiff that he implied that he had been misled for quite some time (first by Debonno, then Goodman and McAuley) about the performance of Logan's clinic system.

136.  During this time, it was when the university (and clinic) budget was finalized.  Plaintiff submitted the clinic budget in June.  Then it was re-evaluated by Petrocco and then by McAuley in July and August.  McAuley slashed our clinic budget significantly, in part due to university wide financial concerns but he also took money out of our budget that was already earmarked for compliance, technology and other key factors that couldn't be removed.

137.  Consequently, Plaintiff and Petrocco had to revise budget again and find other avenues for some funds.  Also, _____ and Kahn (CFO) put in a stipulation that we had to double our clinic revenue by the end of fiscal year.  In the presentation to McDonald and McAuley, Plaintiff and Petrocco stated they could increase by 30-40%.  However, they submitted the final budget with Plaintiff and Petrocco having to double revenue.

138.  On September 1, 2023, Plaintiff was appointed College of Chiropractic Clinical Chief of Staff by Kris Petrocco.  This was a position she had been talking to Plaintiff about since March, after our successful CCE accreditation visit.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

139.  Earlier in May, Goodman moved out of rotations and preceptorships and to IA under Fleck as corporate relationships—just to form the relationship and passing it on to the appropriate person.

140.  Plaintiff had already assumed his duties over preceptorships and rotations and would now assume supervision over the radiology department and the Director of Radiology.  Plaintiff would also absorb the remainder of compliance that she had already taken over and Logan would be terminating its relationship with its outside compliance company so Plaintiff would assume all training for OSHA, HIPAA and all other federal regulations.  Plaintiff would take over as Laser Safety Officer for the Clinic.

141.  Plaintiff was to re-vamp Logan's rotation and preceptorship program and evaluate all of the relationships that were in place and recredential those that were appropriate.

142.  Plaintiff was tasked to re-write all policies and procedures and manuals.  Even though Goodman was making more money than Plaintiff in his previous position (and current one), Plaintiff was only given a $2500 raise for assuming all of those additional duties.

143.  In October, McAuley sent a letter to ARP stating that they were ending our contract with them to have a clinic within our clinic.  However, in the email he stated that he would have them work with Goodman for a

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

'special relationship' in another way/form.   ARP responded with wanting to be in our curriculum, host our student interns, etc.

144.  Gross, Goodman, Petrocco and Plaintiff met to discuss the ARP situation and if Logan wanted to pursue anything going forward.  It was unanimously no (except for Goodman who was still working with them in other capacities).  So, Logan moved forward with not forming any other relationship with ARP.

145.  Sometime after this decision was made, ARP sent Logan an invoice for all equipment they 'loaned' to Logan (through Debonno in 2019) and wanted >$100k+ for the equipment, an amount that could have been substantially more.

146.  In October, Christine Goertz (a Board of Trustee member) came to campus for a board meeting and to meet with Petrocco and Plaintiff on an initiative they were working on with her for Spine IQ (quality patient care initiatives).  Goertz also met with a group of clinicians, front desk staff and students.  She also spoke with Brian McAuley that day.  According to Petrocco, McAuley asked Chris Goertz what she thought of Plaintiff and acted shocked when Goertz told him she thought Plaintiff was doing a great job.  It was very clear to both Petrocco and Plaintiff that he was still against Plaintiff following the ARP situation.

147.  Plaintiff spent October and November tracking down most of the ARP equipment.  Some equipment couldn't be located as it likely was with Debonno (now at a different institution and still working with ARP).

148.  In November, Logan sent back what it had. ARP sent Logan an invoice for approx. $70,000 for the remaining equipment not located.

149.  In October/November, Plaintiff worked with Petrocco and decided to double Logan's flat fee prices (from $10/visit to $20/visit and additional charge of $20 for acupuncture as a separate service) beginning Jan 1, 2024.

150.  Fall/winter 2023 or early 2024 – Plaintiff spoke with Kris Petrocco and then met briefly with Nichole Nichols about McAuley still acting very awkward around Plaintiff and excluding her from things she should be included in (dealings and meetings with our Integrated Health Center sites that Plaintiff supervised, university wide committees and initiatives and many other things).

151.  Nichols told Plaintiff there wasn't a point to meet with him because he likely wouldn't change and he didn't care about Plaintiff necessarily as she couldn't help him become president.

152.  Nichols told Plaintiff that he only cared or associated with those that he perceived could help him obtain the presidency.

153.  Plaintiff also learned from Kris Petrocco that McAuley had already made up his Org Chart for when he would become president. McDonald hadn't even officially announced yet that he was retiring, though we knew it was coming and an approx. timeline.

154.  On January 8, 2024,  McAuley addressed the faculty at a faculty meeting.  He also spoke about a strategic enrollment committee that would be starting soon to focus attention on our enrollment to help stop our budget crisis.  Plaintiff went up to McAuley at the meeting during a break, and asked him to be a part of that committee since clinic is a huge part of Logan's chiropractic program and a large draw for enrollment. McAuley told Plaintiff that he may have a different committee in mind for her instead if he didn't put her on that one.

155.  In February it was clear that he was excluding Plaintiff from the Strategic Enrollment Committee and the Academic Affairs committee.

156.  Plaintiff spoke to Petrocco about it and then Plaintiff emailed him and reminded him that he was going to put her on the committee and how important she felt it was.

157.  McAuley emailed Plaintiff back and said they hadn't begun yet (though they had) and that he would have Plaintiff added to the Academic Affairs committee.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

When Plaintiff saw him in person, he asked her about it and said he had no memory of them speaking about it and that if he had told Plaintiff he would put me on it then he would go ahead and do so.

157.  Plaintiff did not get an official invitation until the second week in March, just prior to her separation from Logan.

158.  The men who held Plaintiff's position as clinic director and were paid more for equal work (some with different titles although performing the same duties or fewer than Plaintiff performed) before her, for comparison of salary discrimination as evidenced by Logan's Form 990s:  Michael Wittmer, Calvin Thomas, Jeffery Kamper, Jason Goodman, Barry Weise, and David Parrish.

159.  Logan also paid (out of pocket, not through its tuition exchange) for Jason Goodman to get a PhD from SLU, and Jeff Kamper to get a MS from University of MO med school.  They would not do the same for Plaintiff, as she asked them to pay for her to get an MBA or MHA.

160. In April 2023, Plaintiff attended a dinner in honor of her boss, Kris Petrocco, and was seated next to Muriel Perillat. Perillat spent the entire two hours apologizing to Plaintiff for how she treated her and how wrong she was. She told Plaintiff the back story for the first time (thereby confirming what Plaintiff already knew) that Alissa Dawson had mislead her and that she should have never believed her.

## Count I
### (Equal Pay Act)

161. Plaintiff restates and realleges paragraphs 1-160 of this Petition

162. At all relevant times, Defendant was an employer covered by and within the meaning of the Equal Pay Act.

163. Defendant discriminated against Plaintiff by providing her with lower pay than similarly situated male employees even though Plaintiff was performing similar duties requiring the same skill, effort, and responsibility of comparable male employees.

164. Plaintiff and similarly situated male employees all perform similar job duties and functions requiring the same skill, effort, and responsibilities, and/or were performing under similar working conditions.

165.  The difference in pay between male and female employees was not due to seniority, merit, quantity of quality of production, or a factor other than sex.

166.  Defendant caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

167.  Plaintiff and Defendant entered into a tolling agreement in 2024 to toll part of the statute of limitations of Plaintiff's wage discrimination claim so that the parties could engage in settlement negotiations.

168.  The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255.

169.  As a result of Defendant's conduct, Plaintiff suffered and continues to suffer harm including but not limited to: lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

170.  By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the EPA including liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

WHEREFORE, Plaintiff prays that judgment be entered against Defendant and that Plaintiff be awarded past, present and future lost wages and benefits; compensatory damages, liquidated damages; pre- and post-judgment interest, costs and reasonable attorneys' fees; any other relief afforded Plaintiff under The Equal Pay Act, and all other relief deemed just and equitable.

## Count II
### (Title VII Pay Discrimination)

171. Plaintiff restates and realleges paragraphs 1-160 of this Petition.

172. This count is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et. seq.

173. Plaintiff timely filed a Charge of Discrimination on July 23, 2024, and received a Notice of Right to Sue on January 23, 2026.

174. Plaintiff was initially hired with a salary of $56,000 per year, despite being promised $60,000 per year. This began a series of discriminatory pay decisions by Defendant because of her sex, where she was paid significantly less than male colleagues.

175. The most recent pay discrimination was regarding Plaintiff's promotion to Clinical Chief of Staff, which began on September 1, 2023. Her male predecessor was paid about $83,000 more per year in annual salary despite substantially more duties assumed by Plaintiff.

176. Defendant discriminated against Plaintiff because of her sex in the terms and conditions of her employment by paying her less than men in the same positions.

177. As a direct and proximate result of the violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et. Seq., Plaintiff has suffered a loss of salary, bonuses, benefits, as well as emotional distress, mental anguish and humiliation.

178. Defendant's decision to pay her differently because of her sex was willful, malicious and with reckless disregard to the rights of Plaintiff, so as to justify the imposition of punitive damages pursuant to 42 U.S.C. § 1981a.

179. Plaintiff has incurred attorneys' fees and costs and will continue to incur such fees and costs in prosecuting this case and is entitled to recover reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(g)(2)(B).

WHEREFORE, Plaintiff respectfully requests the entry of Judgment in her favor and against Defendant for any actual and punitive damages, pre- and post-judgment interest, reinstatement, back pay and benefits, attorneys' fees, costs and any additional relief to which she may be entitled.

### Count III
### (Title VII - Discharge - Retaliation)

180. Plaintiff restates and realleges paragraphs 1-160 of this Petition.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

181.  This count is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et. seq.

182.  Plaintiff timely filed a Charge of Discrimination on July 23, 2024, and received a Notice of Right to Sue on January 23, 2026.

183.  Plaintiff was discharged when she was given the choice of discharge or involuntary resignation as a result of a complaint made regarding an incident Plaintiff self-reported even though it was not a violation of any policy of Defendant, and male colleagues who engaged in worse behavior with co-workers and/or students were not disciplined or discharged by a forced resignation.

184.  Nichole Nichols in Human Resources told Plaintiff that she should not be disciplined regarding this event, which she brought to the attention of her employer. Yet, despite that position from Human Resources, Dr. Brian McAuley was able to push through Plaintiff's discharge, which was motivated by her sex and her complaints about his unlawful behavior and discrimination that she made to Defendant.

185.  Defendant discriminated against Plaintiff because of her sex and because of her complaints in the terms and conditions of her employment by discharging her in circumstances in which men were not disciplined or discharged.

Electronically Filed - St Louis County - April 23, 2026 - 12:00 AM

186.  As a direct and proximate result of the violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et. Seq., Plaintiff has suffered a loss of salary, bonuses, benefits, as well as emotional distress, mental anguish and humiliation.

187. Defendant's decision to discharge Plaintiff because of her sex was willful, malicious and with reckless disregard to the rights of Plaintiff, so as to justify the imposition of punitive damages pursuant to 42 U.S.C. § 1981a.

188.  Plaintiff has incurred attorneys' fees and costs and will continue to incur such fees and costs in prosecuting this case and is entitled to recover reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(g)(2)(B).

WHEREFORE, Plaintiff respectfully requests the entry of Judgment in her favor and against Defendant for any actual and punitive damages, pre- and post-judgment interest, reinstatement, back pay and benefits, attorneys' fees, costs and any additional relief to which she may be entitled.

Respectfully submitted,

THE GHIO LAW FIRM LLC

By:_____
Matthew J. Ghio, #44799

3115 S. Grand Blvd., Suite 100
St. Louis, MO 63118
Phone: (314) 707-5853
matt@ghioemploymentlaw.com
*Attorney for Plaintiff*

Electronically Filed - St. Louis County - April 23, 2026 - 12:00 AM